JOHN L.D. FRAZIER and NANCY FRAZIER, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Frazier v. Commissioner
Docket Nos. 704-92, 8699-92
United States Tax Court
T.C. Memo 1994-358; 1994 Tax Ct. Memo LEXIS 361; 68 T.C.M. (CCH) 253; July 27, 1994, Filed *361 Decisions will be entered under Rule 155. For petitioners: Claude R. Wilson, Jr. and Kemble White. For respondent: Richard D. Fultz and Warren P. Simonsen. DAWSON
DAWSON
MEMORANDUM OPINION DAWSON, Judge: These consolidated cases were assigned to Special Trial Judge Helen A. Buckley pursuant to the provisions of section 7443A(b)(4) and Rules 180, 181, and 183. [1] The Court agrees with and adopts the Opinion of the Special Trial Judge, which is set forth below. OPINION OF THE SPECIAL TRIAL JUDGE BUCKLEY, Special Trial Judge: In these consolidated cases, respondent issued two notices of deficiency to petitioners determining deficiencies in Federal income taxes, additions to tax, and penalties as follows: Docket No. 704-92
Additions to Tax
Year
Deficiency
Sec. 6653(a)(1)(A)
Sec. 6661
1986
$ 40,382
[1] $ 2,019
$ 10,096
1987
24,890
[1] 1,245
6,223
Docket No. 8699-92
Additions to Tax
Penalty Year
Deficiency
Sec. 6653(a)(1)
Sec. 6661
Sec. 6662(a)
1988
$ 26,414
$ 1,321
$ 6,604
- 1989
27,534
- - $ 5,507
1990
33,167
- - 6,633
*362 After concessions, [2] the issues for decision are: (1) Whether petitioners received constructive dividends from Full Service Beverage Company in the form of its reimbursement to petitioner John L.D. Frazier or payment of various expenditures; (2) whether petitioners may deduct a claimed investment interest expense with respect to their sale of an interest in Salida Coca-Cola; (3) whether petitioners are liable for additions to tax for negligence pursuant to section 6653(a)(1)(A) and (B) for the years 1986 and 1987, and pursuant to section 6653(a)(1) for the taxable year 1988; (4) whether petitioners are liable for additions to tax for substantial understatements of income tax liability pursuant to section 6661 for the taxable years 1986, 1987, and 1988; and (5) whether petitioners are liable for penalties for negligence or for substantial understatements pursuant to section 6662(a) for the taxable years 1989 and 1990. *363 Some of the facts have been stipulated, and they are so found. The stipulations, together with attached exhibits, are incorporated herein by reference. Petitioners resided in Wichita, Kansas, when they timely filed their petitions herein. Petitioners John L.D. Frazier and Nancy F. Frazier were husband and wife during the years at issue. References to "petitioner" in the singular relate only to John L.D. Frazier. Petitioners filed joint Federal income tax returns during the years at issue. At trial, the parties addressed the corporate expenditures and reimbursements involved in this case by presenting more than 180 separate "issues". This case presents no substantiation questions regarding the "issues". Petitioners maintained good records. At the conclusion of the trial, the Court requested that the parties present their arguments by arranging these issues into certain broad areas that shared common factual situations. They have done so, and this Opinion reflects that arrangement. We have, however, for purposes of facilitating the Rule 155 computations, included the parties' issues numbers in most instances. For convenience we have combined our findings of fact and opinion *364 with respect to the issues involved in these cases. I. Constructive Dividends - In General
Petitioner was the chairman and chief executive officer of Full Service Beverage Company (FSB) during the years at issue. Its headquarters was in Wichita, Kansas. FSB bottles and distributes a variety of soft drink products, including 7-UP, Dr. Pepper, Orange Crush, and Canada Dry. It also distributes other products such as Evian Water, Mystic, and Snapple. Mrs. Frazier was not an employee, officer, or director of FSB. In January of 1986, various members of three different families owned the stock of FSB. Petitioner personally owned about 10 percent of the stock. Petitioner traveled frequently; Mrs. Frazier often accompanied him. Some of their traveling expenses were paid by trade associations or by soft drink manufacturers. On many occasions, however, FSB paid or reimbursed petitioner for such expenses. Petitioner kept detailed records. He would report his expenditures on vouchers that he provided to FSB on a regular basis. His submissions included records of cash and charge payments, as well as receipts for most of these payments. The general ledgers of FSB also detailed *365 expenditures that petitioner had made and that FSB had paid or reimbursed. Section 301(a) and (c)(1) requires the inclusion in a taxpayer's gross income of amounts received as dividends. Section 316(a) defines a dividend as "any distribution of property made by a corporation to its shareholders -- (1) out of its earnings and profits accumulated after February 28, 1913, or (2) out of its earnings and profits of the taxable year". [3] It is not necessary that the corporation intend a dividend, or that the distribution be termed a dividend or recorded as such. Dolese v. United States, 605 F.2d 1146, 1148 (10th Cir. 1979). Thus, dividends may be either formally declared or they may be "constructive". Ireland v. United States, 621 F.2d 731 (5th Cir. 1980). A constructive dividend is paid when a corporation confers an economic benefit *366 on a shareholder without expectation of repayment. Wortham Machinery Co. v. United States, 521 F. 2d 160, 164 (10th Cir. 1975). The mere fact that expenditures are not deductible by the corporation as business expenses does not make them automatically taxable to the shareholder. To be taxable, the expenditures must represent some direct benefit to the shareholder and have no more than incidental benefit to the corporation. Dolese v. United States, supra at 1152 (citing Palo Alto Town & Country Village, Inc. v. Commissioner, 565 F.2d 1388 (9th Cir. 1977)). In order for a company-provided benefit to be treated as income to the taxpayer-shareholder, the item "must primarily benefit taxpayer's personal interests as opposed to the business interests of the corporation." Ireland v. United States, supra at 735. Petitioners bear the burden of proving that the amounts in issue were not expended for personal benefit or in discharge of personal obligations. Rule 142(a); Welch v. Helvering, 290 U.S. 111 (1933); Challenge Manufacturing Co. v. Commissioner, 37 T.C. 650 (1962); *367 Arnold v. Commissioner, T.C. Memo. 1994-97. In general, when the record does not permit an accurate determination of the amount of such dividends, we may apply our best judgment to approximate that amount. Falsetti v. Commissioner, 85 T.C. 332, 357-358 (1985). [4] Our standard, in reviewing these many expenditures, is whether the expense primarily benefited FSB or petitioners.
*368 II. Business Related Organizations
A. Expenses for NSDA
In each instance, the amounts we have designated as "personal expenses" constitute constructive dividends to petitioners. 1. Taxable Year 1986
In the years 1986 through 1988, petitioner, while president of FSB, also served as chairman of the National Soft Drink Association (NSDA), a national organization of the soft drink industry companies. Petitioner, and often Mrs. Frazier, attended various NSDA functions during the years in issue. Petitioner's NSDA activities were to the direct benefit of FSB in general. Respondent agrees. Some of his expenses, however, were personal. [Issue 8] In May 1986, petitioners attended a convention of the Canadian Soft Drink Association (CSDA). Petitioner attended as chairman of the NSDA. Petitioners flew in a chartered airplane to Lexington, Kentucky, where they picked up Mr. and Mrs. Webber. Mr. Webber was then the president of the NSDA. Petitioners then went to Springfield, Massachusetts, where they visited with their relatives, the Fassetts, and attended the graduation of petitioner's relative, Nancy Fassett. The Webbers, on the other hand, had dinner in Northhampton, *369 Massachusetts, with Al Griggs, who was being courted to be a future chairman of the NSDA. Petitioners and the Webbers then went to Canada. The CSDA paid for petitioner's hotel room and for some of the meals at the convention. Following the Canadian part of the trip, petitioners proceeded to Camden, Maine, where they visited petitioner's sister, and the Webbers proceeded to their summer house. FSB reimbursed petitioner for $ 3,401.95 in expenses related to the trip, not including the costs of some office furniture and a small NSDA reimbursement. The FSB reimbursement included $ 188.70 for 2 nights for Mrs. Frazier's separate hotel room in Canada, plus Mrs. Frazier's and petitioners' son Lloyd's share of meals in the amount of $ 56.67. FSB also paid the $ 1,860.00 cost of renting a "bed and breakfast" house for 2 nights in Maine for petitioners, the Webbers, some relatives, and the pilots of the private aircraft that transported them. A portion of this amount, $ 797.15, was a personal expense. FSB also paid $ 722.30 for meal expenses for the "whole group" on May 27 and 28, 1986. Some $ 401.27 of this amount was personal. FSB additionally paid personal expenses of $ 82.87 for *370 liquor and $ 10.50 for a book. Unexplained miscellaneous expenditures came to another $ 37.31. Petitioners' personal expenses paid by FSB totaled $ 1,574.47; the balance is a business expense of FSB. [Issue 9] FSB also paid some $ 6,381.83 in charges for the chartered aircraft used to transport petitioners, the Webbers, and the two pilots on this trip. The total charges were $ 10,381.35, but NSDA reimbursed petitioner $ 4,000, representing airfare for petitioner and Mr. Webber. Mrs. Frazier's presence, however, did not increase the amounts paid by FSB and thus provides no personal expenditure of corporate funds. This amount is business related. [Issue 15] Petitioner traveled to Washington, D.C. on NSDA business on April 12 through 15, 1986. Mrs. Frazier did not accompany him. While there, petitioner entertained other "bottlers" and their wives. Respondent determined that $ 654.67 of the amount that FSB paid in connection with this trip was for petitioner's personal expenses. Most of that amount, however, was for business-related purposes; FSB's expenditures did not primarily benefit petitioner. Nevertheless, the amounts of $ 40.00 for a billfold and $ 43.34 to entertain *371 petitioner's niece, [5] Martha Fassett, constituted personal expenses of petitioner. The total is $ 83.34. [Issue 22] Petitioner and Mrs. Frazier traveled to Monterey, California, in August 1986, for a meeting of the NSDA board of directors. FSB paid Mrs. Frazier's airfare of $ 384; this constituted a personal benefit to petitioners. [Issue 40] In January 1986, petitioners traveled to the Rolling Rock Country Club in Pennsylvania in connection with a NSDA meeting. FSB paid the following personal expenses of petitioners on that trip: $ 13.00 as Mrs. Frazier's share of lunch; kennel charges of $ 16.50 for petitioners' dog; and $ 39.00 for a book purchased by petitioner. The total is $ 68.50. [Issue 42] Petitioner returned to Washington, D.C. for NSDA business in December of 1986. While *372 he was in Washington, he incurred personal expenses, paid for by FSB, of $ 146.51 for unspecified gifts and notions. 2. Taxable Year 1987
[Issue 50] Petitioners traveled again to Washington on July 5, 1987, in connection with NSDA business. FSB paid personal expenses of $ 11.25 for breakfast for petitioner's niece, Martha Fassett, and $ 22.46 for lunch for petitioners in Wichita; the balance is a business expense. [Issue 55] In April 1986, petitioners returned from a trip to Europe through Washington, D.C., where petitioner again attended to NSDA business. FSB paid hotel expenses of Mrs. Frazier in connection with this trip of $ 420.00, plus $ 22.03 for her meals. These amounts are personal; the balance is business related. [Issue 58] In June 1986, petitioners traveled to Woodstock, Vermont, for a NSDA summer board meeting. They then spent 3 days visiting petitioner's sister in Bath, Maine. FSB paid the following personal expenses of Mrs. Frazier: hotel accommodations in Woodstock of $ 493.71; meals of $ 97.94; and airfare of $ 1,238.50. FSB reimbursed petitioner's purchase of books for $ 15.60 and tickets to a museum for $ 19.00. FSB also paid for petitioners' expenses *373 visiting petitioner's sister in Bath, Maine. The expenses for the visit to Bath, totaling $ 1,812.31, were all personal. FSB also paid $ 10.00 as a counseling fee to a local entity in Wichita. FSB's payment of personal expenditures for this trip totaled $ 3,687.06. [Issue 63] Mrs. Frazier joined petitioner in Chicago for a NSDA meeting November 1 through 4, 1987. FSB paid her airfare of $ 709.00, her lodging of $ 780.00, and her share of meals of $ 394.70. These were personal expenses. Petitioner also incurred $ 851.33 in other personal expenses that FSB paid, including "Rizzoli" books for $ 47.43, $ 29.11, and $ 91.69; "Polo" for $ 247.32; flowers for $ 54.00; Marshall Field for $ 138.78; and "Mungel's Drake Bowl" of $ 243.00. FSB paid a total of $ 2,735.03 relating to petitioners' personal expenses for this Chicago trip. 3. Taxable Year 1988
[Issue 72] FSB paid more personal expenses of petitioners in connection with their travel to Oregon for the NSDA 1988 summer meeting. Petitioner's stay in Portland and elsewhere in Oregon was business related, but expenses incurred by his wife were not. In Oregon, Mrs. Frazier incurred personal expenses of $ 187.40 for meals, *374 lodging of $ 596.40, and airfare of $ 320.00. There were unexplained miscellaneous expenses of $ 129.00. Petitioners also traveled from Oregon to California, incurring substantial additional personal expenses of $ 3,782.63. The total of personal expenses paid by FSB for the trip was $ 5,015.43. 4. Taxable Year 1989
[Issues 114, 130, 131] In August and September of 1989, petitioners traveled to London, Zurich, Nice, Munich, and back to the United States. The cost of the stop in London was personal; FSB paid $ 1,412.73 relating to that portion of the trip. FSB also paid $ 714.00 for Mrs. Frazier's airfare in Europe, which was personal. The portions of the trip pertaining to petitioner's trip to Nice, Zurich, and Munich, however, were related to NSDA business. Petitioners traveled with two other NSDA officials, Mr. Robertshaw and Mr. Reed, and their wives. FSB often paid the expenses for all six persons on this trip. The Robertshaws and the Reeds subsequently reimbursed FSB for their expenses. Respondent has incorrectly included some of these reimbursements in petitioners' income. Respondent asserts that FSB paid $ 3,932.91 in personal expenses with respect to the Zurich *375 portion of the trip. Of this amount, the Robertshaws and Reeds reimbursed FSB $ 948.16; petitioner incurred business expenses of $ 1,889.99; there were $ 65.18 in duplications, and petitioners incurred personal expenses of $ 1,029.58. Respondent further asserts that FSB paid $ 1,609.63 in personal expenses with respect to the Munich portion of the trip. Of this amount, the Robertshaws and Reeds reimbursed FSB $ 668.34, petitioner incurred business expenses of $ 287.63, and petitioners incurred personal expenses of $ 653.66. Respondent next asserts that FSB paid $ 7,683.16 in personal expenses with respect to the Nice portion of the trip. Of this amount, the Robertshaws and Reeds reimbursed FSB $ 3,119.20. That amount is not income to petitioners. Also, petitioner incurred business expenses of $ 3,265.18 and incurred personal expenses of $ 1,298.78. [6] The remainder of amounts in this issue were duplications by respondent of expenses already deemed personal in the notice of deficiency. *376 [Issue 137] Petitioner traveled to Las Vegas on NSDA business in October 1989. While there, he purchased some drinks for himself and others; these were not personal expenditures. He also purchased some ties for $ 112.89; these expenses were personal. 5. Taxable Year 1990
[Issue 154] Petitioners traveled to Washington June 1 through 4, 1990, where petitioner had business with NSDA. FSB paid personal expenses including $ 52 for meals for Mrs. Frazier and for petitioner's niece Martha Fassett, and $ 4.84 for Mrs. Frazier's share of another meal. [Issue 166] Petitioners flew to Chicago for another NSDA function in September 1990; their airfare was $ 693.00. NSDA reimbursed $ 416.50; FSB paid the balance, some $ 276.50. It is attributable to Mrs. Frazier's personal expenses. B. Expenses for Interbev-Interbrau
[Issues 3, 4] In 1986, petitioner submitted an expense voucher to FSB for $ 13,651.61. This represented a trip for him in June 1986, to London, Paris, Deauville, and Venice. [7] The portions of the trip dealing with London and Paris involved petitioner's attempt to increase membership in "Interbev-Interbrau", a worldwide alliance for exhibition purposes of beverage *377 manufacturers. Some of the expenses reimbursed by FSB related to FSB business. Respondent has determined that some $ 9,574.75 were personal expenses. Petitioners have borne their burden of proving that the London Interbev expenses of $ 1,110.28, the Paris Interbev expenses of $ 1,029.77, glassware for the office of $ 2,337.80 and a business gift of $ 232.50 were business related. The balance, some $ 4,864.40, is a personal expense of petitioners. C. Expenses for Carbonated Beverage Institute
[Issue 53] During the last 2 weeks of January 1987, petitioners went to Houston, then traveled through the Caribbean. Part of the Houston trip involved discussions with physicians who were providing medical treatment to their son Lloyd. Petitioners stopped for a few days at Palmas Del Mar, *378 Puerto Rico, for a meeting of the Carbonated Beverage Institute (CBI). This is an organization of independent bottlers. Petitioner incurred costs of $ 3,243.08 while at the CBI meeting. This figure constitutes a business expense; it excludes Mrs. Frazier's meals in Puerto Rico and her airfare. The balance of the voucher, $ 4,865.16, constitutes FSB's payment of petitioners' personal expenses. [Issue 81] In January 1988, petitioners returned to the Caribbean, on the Island of St. Croix, for another CBI convention. FSB advanced some $ 4,145.50, and petitioners spent another $ 2,812.07, for a total of $ 6,957.57. Petitioner incurred FSB business expenses of $ 3,500 -- slightly more than half those incurred on the trip. The balance, $ 3,457.57, is a personal expense of petitioners. It is well established that a corporation's payment of claimed travel and entertainment expenses of its shareholder can constitute a constructive dividend to that shareholder. Challenge Manufacturing Co. v. Commissioner, 37 T.C. 650, 663 (1962); Bruce Oil Co. v. Commissioner, T.C. Memo. 1984-230; Perma-Rock Products, Inc. v. United States, 373 F. Supp. 159, 169 (D. Md. 1973). *379 Travel and entertainment expenses have a central role in the business world. Dowell v. United States, 522 F.2d 708, 711 (5th Cir. 1975). Nevertheless, travel and entertainment expenses are of such nature as to afford considerable opportunity for abuse. Thus, "it is not too much to ask of a taxpayer seeking to prove them that he offer reasonably satisfying proof not only that the expenses were in fact incurred, but also that such expenses were in fact incurred on behalf of the corporation." Bruce Oil Co. v. Commissioner, supra.
A related issue arises when the corporation reimburses a shareholder for travel and entertainment expenses incurred by his or her spouse. Such payments often give rise to constructive dividends to the shareholder. Even though the corporation may have a policy of encouraging the shareholder to bring his or her spouse along on trips, the corporation's payment of the spouse's expenses will give rise to a constructive dividend when the spouse's "primary purpose [in traveling] was to socialize". Meridian Wood Products, Inc. v. United States, 725 F.2d 1183, 1190 (9th Cir. 1984). *380 In Meridian Wood Products, the president and 50-percent shareholder of the corporation traveled on business with his wife. The corporation reimbursed her travel and entertainment expenses. The Court of Appeals affirmed treating such reimbursements as constructive dividends to the president-shareholder. The District Court had determined that it was evident that the wife's function while traveling "was to be a socially gracious wife, not a professional woman." Id., citing United States v. Weatherford, 418 F.2d 895, 897 (9th Cir. 1969); see also Challenge Manufacturing Co. v. Commissioner, supra; Alabama-Georgia Syrup Co. v. Commissioner, 36 T.C. 747, 768-769 (1961), revd. and remanded on other issues sub nom. Whitfield v. Commissioner, 311 F.2d 640 (5th Cir. 1962); L.R. Schmaus Co. v. Commissioner, T.C. Memo. 1967-197, revd. on other issues 406 F.2d 1044 (7th Cir. 1969). In these cases our findings show that many of the expenses that FSB paid on behalf of petitioner were business-related *381 expenses of FSB. Many others, however, are personal expenses; these amounts are also set forth in our findings. Petitioners have demonstrated that the purpose of their trip to Canada and New England had some relationship to FSB's business. Thus, petitioner's expenses in Canada and those attributable to the Webbers were business-related expenses of FSB. The stops to attend a niece's graduation and to visit petitioner's sister, however, were personal, as were all of Mrs. Frazier's expenses. We have made similar distinctions with respect to other trips. Concerning the trip to St. Croix, we have determined the expenses which were business related and those which were personal. Petitioners insist that FSB's payment of Mrs. Frazier's expenses while traveling with her husband are also the payment of business-related expenses. The evidence has in fact shown that, on one or two occasions, she acted primarily as a representative of FSB. For example, in July 1990, Mrs. Frazier attended a picnic for company employees in Colorado, an occasion when other employees of FSB were encouraged to bring their wives and families. As to that occasion, we would have rejected respondent's attempt *382 to term the expenses for Mrs. Frazier as constructive dividends. Respondent, however, has conceded that issue based on evidence adduced at trial. As to the other occasions, petitioners have failed to demonstrate that Mrs. Frazier's social duties were other than incidental when compared to the personal benefit she and her husband derived. Petitioners stress Mrs. Frazier's role in socializing at the various conventions and industry gatherings, but they have not shown that her primary role was to function as a representative of FSB. Petitioners point to some cases, such as Bank of Stockton v. Commissioner, T.C. Memo. 1977-24, and United States v. Disney, 413 F.2d 783 (9th Cir. 1969), in which it was held that a shareholder did not receive constructive dividends when the corporation paid the spouse's expenses at a convention. In Bank of Stockton v. Commissioner, supra, the record showed that the corporation paid the expenses of many spouses whose husbands were not shareholders. Additionally, the spouses attended business meetings of the convention. In United States v. Disney, supra, *383 the taxpayer made an extensive showing that his wife enhanced the company's image, and that she had assisted her husband in his business activities. Here we lack such an "extensive showing", except for those few expenditures now conceded by respondent. See Meridian Wood Products, Inc. v. Commissioner, supra at 1191. We hold that Mrs. Frazier's attendance at the meetings was not proximately related to FSB's business. III. Organizations for Chief Executive Officers of Corporations
A. YPO, CEO, and SOP Expenses
1. Taxable Year 1986
[Issue 10] Between January 17 and 19, 1986, petitioners went to Newport Beach and to Palm Springs, California. The meeting in Palm Springs concerned the "Young Presidents' Organization" (YPO). Petitioner was a member of the YPO, an organization of individuals who become chief executive officers of businesses prior to age 40 but who have not reached age 50. Each year, YPO puts on two learning programs, called "universities", which last approximately 1 week. FSB's $ 1,781.44 payment in connection with this trip constituted payment of petitioners' personal expenses. [Issue 3] The Venice portion of the European trip taken in *384 June 1986, mentioned above, concerned petitioner's investigation of facilities for a meeting of the YPO. Petitioner went to Venice to evaluate hotels and restaurants that were to be used by the YPO during a "university" in Italy. The expenses related to the YPO were not primarily made for the benefit of FSB; they were personal expenses of petitioner. These personal expenses are included in the total amounts we have found to be personal expenses with respect to this trip; see page 13, supra. [Issue 32] Petitioners also traveled to Venice in connection with the YPO "university" in October 1986. FSB paid $ 5,779.00 for their airfare and $ 1,054.75 in other expenses. These are personal expenses of petitioners; they do not include the business-related amount of $ 1,130.00 that petitioner spent for glassware for the FSB offices. [Issue 41] Petitioners traveled to Laguna Niguel, California, during the last week of September 1986, in connection with a function of the Chief Executives Organization (CEO). This is an organization composed of former members of the YPO who have passed the age of 50. FSB paid all of petitioners' $ 4,146.25 expenses on this trip. The trip was a personal *385 one for petitioners. 2. Taxable Year 1987
[Issue 55] Petitioners traveled to London to attend a CEO spring forum March 27, 1987, through April 2, 1987. They incurred expenses, reimbursed by FSB, of $ 2,247.23. In connection with this trip, petitioners traveled to Paris for the weekend of April 3, 1987, and incurred additional expenses, reimbursed by FSB, of $ 2,864.56. All these expenses were personal expenses. [Issue 56] In 1987, petitioners again attended YPO functions in Venice. They traveled to Venice in connection with other stops in Europe which related to petitioner's business. Mrs. Frazier's airfare of $ 3,106.00, and $ 9,071.90 in other expenses attributable to the YPO visit in Venice, however, were personal to petitioners, but paid by FSB. These expenses totaled $ 12,177.90. The balance of the amounts reimbursed, some $ 11,086.50, was a business expense of FSB. 3. Taxable Year 1988
[Issue 67] In 1988, FSB paid $ 700 in dues for petitioner's membership in the CEO. This was the payment of his personal expense. [Issue 76] In 1988, FSB also paid $ 200 as petitioner's dues for the Senior Organization of Presidents (SOP). This is a group of Wichita businesspersons *386 who believe that they have a common tie and who meet periodically to discuss their business operations, seeking to be an effective force in the Wichita community. This payment also represents a personal expense. 4. Taxable Year 1989
[Issue 77] In 1989, FSB paid $ 108.39 to cover the costs of petitioner's attendance at a YPO Christmas party. This was his personal expense. [Issue 132] In 1989, FSB also paid another $ 800.00 for petitioner's dues in the CEO. This, again, was a personal expense. [Issue 133] From October 13, 1989, through October 20, 1989, petitioners attended the CEO "Fall Forum" in San Francisco. The amount paid or reimbursed by FSB relating to this trip totaled $ 6,809.93; it constitutes a personal expense of petitioners. 5. Taxable Year 1990
[Issue 139] In 1990, FSB again paid $ 200 for petitioner's SOP dues. This was a personal expense. B. World Business Council Costs
[Issue 80] In 1988, FSB paid $ 10,850.00 for petitioner to go to a meeting of the "World Business Council" in Brazil. The World Business Council is a business alliance, described by petitioner as an "entrepreneurial chief executive type organization". Petitioner cancelled *387 this trip, however, because he had been invited to Europe. FSB was unable to recover $ 8,753 of the amount paid. Petitioners have not demonstrated that FSB would have incurred more than an incidental benefit from this expenditure; the unrecovered portion of that amount is a personal expense of petitioners and represents a constructive dividend to them. In Cambridge Hotels, Inc. v. Commissioner, T.C. Memo. 1968-263, we addressed the issue of a corporation's payment for its president's participation in the YPO. There we found that the taxpayer had not met its burden of proving that the expenditures for dues and for attendance at YPO conventions were proximately related to the corporation's business. We noted that there was insufficient evidence of the president's attendance at lectures, and we noted our impression that the lectures sponsored by the YPO were aimed at a general personal betterment of the participants, rather than at the conduct of business. While we noted that any incidental social contacts made at YPO sessions might have aided the corporation indirectly, we determined that any such incidental benefits did not justify considering the *388 expenses as being business expenses. In the instant cases the record contains even less evidence than that set forth in Cambridge Hotels about the business-oriented activity of the YPO, or, for that matter, of the SOP, the CEO, and the World Business Council. There is no evidence of a connection with the business of FSB. Petitioners have not presented us with a basis upon which to distinguish our holding in Cambridge Hotels, and we are unable to find that the expenditures for petitioners' participation in their activities were primarily for the benefit of FSB, as opposed to petitioner's general personal betterment. Here, as in Cambridge Hotels, petitioners' evidence "that the business benefited * * * is far from the kind of evidence that is necessary to show a proximate relationship between the expenditures * * * and the business." Larrabee v. Commissioner, 33 T.C. 838, 842 (1960). We are also aware that, in Newport Beach, California, while petitioner was presumably occupied with YPO business, Mrs. Frazier met with some merchants who had sent china to FSB that the petitioners found to be defective. We are not convinced that her efforts *389 in this regard have transformed what was a personal trip for petitioners into a business trip on behalf of FSB. FSB's payments for petitioners' activities with respect to the YPO, the CEO, the SOP, and the World Business Council represent constructive dividends to petitioners. IV. Confrerie and Wine and Food Club Expenses
Petitioner was a member of the Confrerie de la Chaine des Rotisseurs (Confrerie), an international organization whose members have a common interest in gourmet foods. He also belonged to an organization called the Wine and Food Society, which was "much like the Confrerie". [Issue 2] In 1986, FSB paid $ 311.90, on behalf of petitioner, who attended a Confrerie dinner with Bill Benson, a long-time associate who had worked on many projects for FSB. [Issue 37] FSB also paid $ 500.00 for petitioner's membership in the Wichita chapter of the Wine and Food Society. [Issue 44] Later in 1986, FSB also paid $ 276.20 on behalf of petitioner, who attended a Confrerie function with his son and a fellow shareholder, John Shawver. [Issue 82] In 1988, FSB paid $ 554.80 for a Confrerie dinner at which petitioner again hosted Mr. Shawver. [Issue 83] FSB paid another *390 $ 300 for a Confrerie dinner attended by petitioners. [Issue 84] FSB also paid $ 330 as petitioner's Confrerie dues for 1988. [8]
[Issue 122] In 1989, FSB again paid petitioner's Confrerie dues and the expenses of a Confrerie-sponsored Cinco de Mayo dinner. The total was $ 305.46. [Issue 136] In that year, FSB also again paid petitioner's dues of $ 500 for membership in the Wine and Food Society of Wichita. All of the food society dues and costs are personal in nature to petitioners and not proximately related to FSB's business. It is well settled that a corporation's payment of the meal expenses of its shareholders does not constitute a "business expense", even when the shareholders discuss business. Moss v. Commissioner, 80 T.C. 1073, 1080-1081 (1983), *391 affd. 758 F.2d 211 (7th Cir. 1985); Mizell v. Commissioner, T.C. Memo. 1988-69. Instead, such payments of shareholders' meal expenses constitute constructive dividends. It is only when the shareholders establish that there is a primary business purpose to the meal that such amounts do not constitute constructive dividends. Ma-Tran Corp. v. Commissioner, 70 T.C. 158, 171 (1978). Mizell v. Commissioner, supra (citing Sharon v. Commissioner, 66 T.C. 515, 524 (1976), affd. per curiam 591 F.2d 1273, 1275 (9th Cir. 1978)). Accordingly, a taxpayer may not avoid constructive dividend treatment for reimbursed meal expenses by claiming that he was educating himself and keeping himself informed on what was going on in the world of fine dining -- unless he proves that his dining expenses had a primary business purpose. Cambridge Hotels, Inc. v. Commissioner, supra.
Petitioner contends that his membership in these gourmet societies was necessary to keep himself informed about *392 what was "hot" in the soft-drink market -- European sparkling waters, imported fruit drinks, and the like. He stressed that he made contacts with restauranteurs who were customers for his soft drinks. We are not convinced. The memberships of these societies were not primarily interested in soft drinks. They were interested in fine foods and wine. Any contacts and knowledge of the beverage markets that FSB may have gained through petitioner's membership was incidental. The record of 5 years' expenses in these cases shows plainly that petitioner was a gourmand and an epicure. His memberships in the Confrerie and in the Wine and Food Society were primarily personal. Nor do we find a business purpose in petitioner's hosting his son and John Shawver, his fellow shareholder, at Confrerie functions. Neither Lloyd nor John Shawver were employees or officers of FSB, and we can find no basis for holding that FSB's payment of their expenses at the Confrerie functions primarily benefited the corporation. [9]
*393 In 1986, petitioner entertained Mr. Benson, an architect who had worked on many past projects for FSB. Petitioner's testimony indicates that this meal was a reward for past service, and that "we didn't talk about engineering of buildings". To us, this hosting of Mr. Benson appears to be a personal expression of goodwill on petitioner's part and not a business expense of FSB. Accordingly, we conclude that FSB's payments of expenses relating to petitioner's membership in the Confrerie and the Wine and Food Society were in the nature of personal expenditures, and they constitute dividend income to him. V. Country Club and Social Club Expenses
[Issue 96] FSB paid $ 2,331.00 in dues for petitioner's membership in the Wichita Country Club during 1988. [Issue 117] In 1989 FSB paid $ 3,680.30 in dues and meal expenses to the Wichita Country Club, and it paid another $ 230.24 in 1990. Petitioner does not play golf or tennis, and most of the expenses at the country club relate to business meals. Any benefits to petitioners from the payment of dues were incidental. Some miscellaneous amounts spent at the country club, however, were personal expenditures. These include shoe *394 shine expenses of $ 24.00 and $ 76.94 for dinner for the president of Friends University in January 1989. In February, petitioner's $ 4.66 share of a breakfast for Young Kansans for Christ was personal. In August, dinner expenses of $ 110.02 to discuss problems that the Salvation Army was having with United Way were personal. In October, FSB's payment of $ 68.84 in expenses for petitioner and John Shawver, who were later joined by their wives, was personal. In December, $ 63.97, the cost of four lunches with Mr. Langel concerning a stock fight with Mr. Browne, was also personal. [Issue 118] FSB also paid for dues and meals during 1989 at a separate establishment, the Wichita Club. This is a downtown luncheon club. Petitioner went there principally for business purposes. He lunched with Mr. Swanson, who manufactured truck trailers, important items in FSB's business. Another lunch was with Mr. Glenn, FSB's tax adviser. Petitioners have not shown, however, that petitioner's expenses related to serving on the Wichita's Club's wine committee aided FSB. These expenses totaled $ 205.31; petitioners have also failed to explain another wine-related expense of $ 191.14. These two *395 amounts last mentioned are personal expenses; the balance is business related. [Issue 119] FSB also paid for meals at the Candle Club, a neighborhood eating club. Respondent argued that some $ 418.99 of this amount constituted personal expenses to petitioners. This amount, however, includes the following business-related expenses: $ 34.36 for a meal in January 1989 with Mr. Small, who represented Pizza Hut and Pepsico; $ 17.39 for a meal with Mr. Manning, who was an insurance agent; and $ 35.73 for a meal with Mr. Swanson. The balance, some $ 331.51, constitutes personal expenses of petitioners. [Issue 120] FSB paid some $ 880.89 with respect to petitioner's organizing and hosting a shooting party in September 1989. FSB also paid the expenses of another of its employees, who assisted petitioner in his efforts. This expedition took place at Flint Oak Ranch in Fall River, Kansas. These expenses primarily related to the soft-drink bottling business; they were not made for petitioner's personal benefit of petitioner. A corporation's payment of club membership dues and club meal expenses for a shareholder does not constitute dividend income to the shareholder when those expenses *396 are primarily for business purposes of the corporation. Henry Schwartz Corp. v. Commissioner, 60 T.C. 728, 743 (1973); TennesseeSecurities, Inc. v. Commissioner, T.C. Memo. 1978-434, affd. 674 F.2d 570 (6th Cir. 1982). Of course, corporate payment of club fees and meals for the personal benefit of its shareholders constitutes constructive dividend income to those shareholders. Coors v. Commissioner, 60 T.C. 368, 408 (1973), affd. 519 F.2d 1280 (10th Cir. 1975). Even if petitioners can establish that the club meal expenses were primarily business expenses, however, those expenses that are attributable to personal expenses will constitute income to the shareholder. Commissioner v. Riss, 374 F.2d 161, 170 (8th Cir. 1967), affg. in part, revg. in part, and remanding T.C. Memo. 1964-190. FSB's payment of petitioner's expenses at the Wichita Country Club, the Wichita Club, and the Flint Oak Ranch were primarily business related. We have noted the exceptions. In this regard, while *397 dining at the Wichita Country Club, petitioner and Mr. Shawver discussed the acquisition of another company; it is not evident that their discussions were helpful to FSB. Lunches at the country club in December with Mr. Langel concerning a stock fight are not obviously beneficial to FSB. They appear to benefit petitioner personally in his status as a shareholder. Similarly, petitioners have not demonstrated that FSB benefited from petitioner's discussions with David Brasted over several meals at the Candle Club, even when the talk turned to shareholder problems. Again, any benefit from these expenses would apparently redound to petitioner in his status as a shareholder. These amounts are personal to petitioner. Respondent also asserts that $ 880.89 of the amounts expended for a shooting expedition at the Flint Oak Ranch were for petitioner's personal benefit. We disagree. Petitioner's testimony convinces us that the expenses were undertaken in an attempt to recruit a well-known candidate to take over as chairman of the NSDA. He was not a marksman, as the expenditures for shooting lessons attest. These amounts were not personal to petitioner. VI. Personal Expenses Incurred *398 by Lloyd Frazier
[Issue 32 - Dallas portion] On October 14, 1986, petitioners traveled to Dallas for an NSDA meeting in Dallas, Texas, where FSB has a large bottling facility. While in Dallas, petitioners entertained their son Lloyd and some of his friends. Lloyd was a student at Southern Methodist University, majoring in cinema. Petitioner had hopes, however, of getting Lloyd involved in the family business. FSB reimbursed the costs of a dinner, of which some $ 225.96 represented personal expenses for Lloyd, his friends, and Mrs. Frazier. FSB also reimbursed $ 382.06 for a dinner at which petitioners, with Lloyd, again entertained the Webbers (Mr. Webber was president of NSDA). Half of this amount, $ 191.03, was petitioners' personal expense. [Issue 34] In November 1986, FSB paid $ 425 airfare to bring Lloyd Frazier from Dallas to the shareholders' meeting in Wichita and then to return him to his studies in Dallas. Lloyd was not an employee of FSB at that time. The $ 425 is petitioners' personal expense. [Issue 65] In November 1987, FSB paid $ 229.36, attributable to Lloyd's airfare and spending money while attending a victory party in Oklahoma City to celebrate FSB's *399 acquisition of a company named "All-American". This amount is petitioners' personal expense. [Issue 70] In February 1988, petitioner traveled with Lloyd to visit petitioner's sister in San Francisco. [10] They then traveled to Rolling Rock, Pennsylvania, for an NSDA meeting. The amount of expenses FSB paid for the San Francisco portion of the trip was $ 1,729.40. Lloyd incurred an additional $ 120.00 expense in Pennsylvania, possibly spending money, which was paid or reimbursed by FSB. The total of these two amounts, $ 1,849.40, constitutes petitioners' personal expenses. [Issue No. 92] FSB's ledgers show an airline expense of $ 735.00 for Lloyd's attendance at the Rolling Rock Country Club in Pennsylvania with his father. This was a personal *400 expense to petitioners. [Issue 103] FSB also made a further payment of $ 528.00 for Lloyd's travel expenses in 1988. This too is petitioners' personal expense. [Issues 157, 159, 161 - 165] On September 30, 1990, petitioner and Lloyd traveled to Middleburg, Virginia, to attend another NSDA function. Most of the expenses were business-related, but a number were personal. FSB paid $ 316.00 for Lloyd's airfare; that was a personal expense of petitioners. FSB paid for dinner for petitioner, for Lloyd, and for petitioner's niece Martha Fassett. FSB's expenses for petitioner were business related; its $ 63.33 payments for his son's and niece's meals were personal. FSB paid $ 101.00 for lunch in Purcellville, Virginia, for various people connected with the soft drink industry; Lloyd's share came to $ 11.22. Martha Fassett joined petitioner for drinks with other people connected with the NSDA. FSB's payment of her share of $ 11.10 was a personal expense of petitioners. FSB again paid for meals for Lloyd and Martha Fassett at a restaurant named Chadwick's; their share of the bill totaled $ 26.67. FSB paid personal telephone charges of $ 6.78. FSB also paid $ 9.00, Lloyd's share *401 of meal expenses in Chicago, Illinois, on the way home. Again, Lloyd's and Martha Fassett's expenses were not related to FSB's business. [Issue 167] Lloyd Frazier went with his parents to Chicago late in October 1990, on an NSDA trip. FSB paid for 4 nights of Lloyd's lodging; his parents had another room. Lloyd's expense of $ 831.76 was petitioners' personal expense. [Issue 168] A separate room service charge of $ 23.00 was not a personal expense of petitioners, however; it was incurred for business entertainment in the hotel. [Issue 169] Separate bar bills totaling $ 59.82 were similarly for business entertainment and were not personal. A corporation's payments to, or on behalf of, children of its shareholders can constitute constructive dividends to the shareholders when the payments are made to satisfy personal parental objectives as opposed to the bona fide business purposes of the corporation. Engineering Sales, Inc. v. United States, 510 F.2d 565, 569-570 (5th Cir. 1975); 58th Street Plaza Theatre, Inc. v. Commissioner, 195 F.2d 724, 725 (2d Cir. 1952), affg. 16 T.C. 469 (1951). *402 Thus, shareholders are taxable on amounts that their corporations pay for their children's travel and meal expenses. Snyder v. Commissioner, T.C. Memo. 1983-692; see Zimco Elec. Supply Co. v. Commissioner, T.C. Memo. 1971-215. FSB's substantial expenditures for Lloyd's travel expenses are, on their face, personal expenses of petitioners. Lloyd Frazier became a full-time employee of FSB, but he did not do so until 1991, after the taxable years in issue. Before then, FSB had no business interest in paying for his travel and other expenses. These were petitioners' expenses. Similarly, petitioners have failed to prove that FSB's expenses of entertaining petitioner's niece primarily benefited FSB. These, too, were personal expenses of petitioners. Petitioners argue that many of these expenses were necessary in getting Lloyd acquainted with the soft-drink business. They contend that the business would continue to be a family-owned enterprise, and that the employees would be encouraged by seeing the next family member being groomed to take over. Petitioners have failed to convince us. FSB and its employees might well *403 have an interest in recruiting well-qualified young men and women to come into its management ranks. We perceive no reason, however, why FSB should be particularly interested in spending substantial sums to recruit Lloyd Frazier. Grooming Lloyd to take over FSB was primarily a personal hope of petitioners, not a legitimate business goal of FSB. VII. Expenses Incurred in Connection with Medical Treatment
A. Petitioner's Medical Expenses
1. Mayo Clinic
[Issue 52] FSB had loan agreements with Fuji Bank (the bank), under which FSB was required to buy life insurance on petitioner's life, payable to FSB, in the amount of $ 5 million (hereafter key man insurance). Petitioner, however, had substantial health problems, both in the past and the present, and FSB was unable to buy that amount of insurance on his life. FSB was, therefore, in technical default on its loan agreements until it was able to convince the bank to accept the $ 2.5 million in insurance which it was able to buy. However, in order to buy even that amount of insurance, the insurance companies refused to accept the physical examination and its results by petitioner's Wichita doctor. Petitioner therefore *404 went to the Mayo Clinic in Rochester, Minnesota, in order to undergo physical examinations so that FSB would be able to acquire the key man life insurance. Prior to the years at issue, petitioner did not regularly go to the Mayo Clinic. Further, FSB saved a substantial sum each year in premiums on the insurance as a result of the Mayo reports. The expenses in connection with petitioner's trips to Rochester were related to the business of FSB and not to petitioners personally. Some expenses incurred, however, were personal and constitute constructive dividends to petitioners. Petitioners traveled to the Mayo Clinic in Rochester, Minnesota, on February 8 and 9, 1987. FSB paid the $ 1,690.97 expenses of this trip. Of this amount, the personal expenses include $ 152.80 for Mrs. Frazier's travel expenses, meals for others totaling $ 21.21, a diabetes book for $ 19.00, and registration for the CEO Club of $ 526.00. [11] These personal expenses total $ 719.01. [Issue 54] FSB also spent $ 700.00 to charter an airplane so that petitioners could make this trip. It is a business expense of FSB. *405 [Issue 71] FSB spent an additional $ 537.77 for petitioner's trip to the Mayo Clinic in 1988. This expense again related to obtaining favorable insurance rates on the key man life insurance policy. These are business expenses and do not constitute income to petitioners, with the exception of $ 92.45 in meals for Mrs. Frazier and others, and miscellaneous expenses of $ 51.26. [Issue 85] Associated with that trip were auto rental expenses of $ 71.29 paid by FSB. These were also related to FSB's business and were not a personal benefit to petitioners. [Issue 123] Petitioners returned to the Mayo Clinic on May 22 through 25, 1989. FSB paid $ 709.56. Most of this is attributable to the business of FSB. Some $ 212.15 of this amount, however, was paid for petitioners' personal benefit. This latter amount includes $ 58.72 for dinner for Mrs. Frazier and others, $ 40.85 for Mrs. Frazier's share of other meals, $ 88.00 for her separate hotel room, and $ 24.58 for unexplained miscellaneous expenses. [Issue 124] Petitioner returned to the Mayo Clinic by himself 3 weeks later. FSB paid for these expenses also. These expenses included costs for his hotel stay and return airfare totaling *406 $ 759.11, which are expenses related to the business of FSB and not for the personal benefit of petitioners. 2. Other
[Issue 79] In April 1988, petitioner traveled alone to Washington, D.C. He was reimbursed by FSB for some personal medical expenses, including a physician's charges of $ 97.00, pharmacy bills of $ 15.96, and a cold medication of $ 9.50. These amounts are all personal. B. Expenses Related to Lloyd Frazier's Medical Medical Treatment
[Issue 5] The record does not support petitioner's contention that there was an FSB plan to cover the medical expenses of family members of officers and employees. On April 27 and 28, 1986, petitioners and Julie Lane, a friend of Lloyd's, traveled to Houston, Texas, to visit Lloyd. He was then a student at Southern Methodist University in Dallas, but at the time of the visit, he was in Houston recuperating from surgery. FSB paid the travel expenses of $ 3,448.52 in connection with this trip; they are petitioners' personal expenses. [Issue 17] FSB spent $ 1,345.98 on a trip of petitioner's to Dallas and Houston. [12] His wife joined him in Dallas, and they went from Dallas to Houston concerning Lloyd's medical treatment. *407 Of the amount paid by FSB, $ 850.05 is attributable to personal expenses relating to Lloyd's treatment. [Issue 26] Petitioners again visited Lloyd in Houston on May 2 and 3, 1986; FSB paid the cost of this trip, which was a personal expense, of $ 1,453.41, plus $ 98.10 for a rental car in Houston. [Issue 28] Petitioners chartered a private airplane that brought them and their son to Wichita from Houston on May 4, 1986. FSB paid the cost of this charter, which was a personal expense to petitioners, in the amount of $ 3,337.50. [Issue 29] FSB also paid $ 768.07 for Lloyd and his mother to return to Houston concerning Lloyd's medical condition on May 19 and 20, 1986. This again was a personal expense. [Issue 51] FSB paid the $ 124.00 airfare for Lloyd Frazier to travel from Phoenix, Arizona, where he had been receiving medical treatment, to Wichita on April 17, 1987. *408 This also is petitioners' personal expense. Special provisions of the Internal Revenue Code govern employer-paid medical expenses for employees and their dependents. Section 105(a) includes in gross income amounts received through "accident or health insurance" for injuries or sickness that are attributable to the employer's contribution. Section 105(b), however, provides that gross income does not include reimbursed medical expenses for the taxpayer or his spouse or dependents. Section 105(e) provides that amounts received under an "accident or health plan for employees" shall be treated as amounts received through accident or health insurance. When a corporation reimburses the medical expenses of a shareholder-employee or his family, those amounts are includable in the income of that shareholder-employee unless that individual can prove two essential facts: (1) that a "plan" as such existed, and (2) that the "plan" was for the benefit of the corporation's "employees" as opposed to its shareholders. Levine v. Commissioner, 50 T.C. 422, 427 (1968); Larkin v. Commissioner, 48 T.C. 629, 633 (1967), affd. 394 F.2d 494 (1st Cir. 1968). *409 Absent such proof, the corporation's payment of medical expenses for a shareholder-employee or for members of his family will be considered to be constructive dividends to the shareholder. Cummins Diesel Sales of Oregon, Inc. v. United States, 321 F.2d 503 (9th Cir. 1963); Bongiovanni v. Commissioner, T.C. Memo. 1976-131, affd. without published opinion 556 F.2d 584 (7th Cir. 1977). FSB had no written plan, and the record does not indicate that there was an unwritten plan for employees and their families. This Court has made clear that discretionary or ad hoc payments of medical expenses are not covered by the exclusions of section 105. Lang v. Commissioner, 41 T.C. 352, 356 (1963); Estate of Kaufman v. Commissioner, 35 T.C. 663, 666 (1961), affd. 300 F.2d 128 (6th Cir. 1962). Petitioner's Mayo Clinic costs were intended to help acquire and save FSB money on its key man insurance policy which it was obliged by its creditors to obtain. As such, the expenses to acquire the insurance and reduce these premiums *410 were incurred for the legitimate business purposes of FSB. They are not personal expenses of petitioners. Questions of the applicability of section 105 are not relevant. Section 105 does apply, however, to require the inclusion in income of the costs of the physician, pharmacy, and cold remedy paid by FSB for petitioner when traveling. Petitioners have not shown that these costs were reimbursed pursuant to a plan that was available for FSB's employees, as opposed to its shareholders. With respect to Lloyd, petitioners argue that FSB has had a long-standing policy of paying for the health-related travel expenses for members of petitioners' family. Even if such a policy existed, however, petitioners have failed to prove that it existed for the employees of FSB, as opposed to its shareholders. Thus, the payments for travel relating to Lloyd's surgery, even if they are properly called "medical" expenses, are not deductible under the provisions of section 105. They are thus income to petitioners. [13]
*411 VIII. Miscellaneous Personal Expenses Incurred by Petitioners and Paid by FSB
The parties have contested the status, as constructive dividends, of other unnumbered "issues" regarding FSB's expenditures. Respondent has explicitly conceded some of these matters but continues to contest the two discussed below. In 1986, FSB sent a check to the Yale Alumni Association of Wichita in the amount of $ 1,116.64. This amount, with similar contributions from others, was spent to sponsor the appearance in Wichita of the Wiffenpoofs, a singing group from Yale University. A student from a nearby town was a member of the Wiffenpoofs, and his parents had sought to have the group appear in Wichita. Petitioner was a graduate of Yale University. FSB's $ 1,116.64 payment was of a personal benefit to petitioners. Any benefit to FSB was no more than incidental. We note that, on brief, respondent has conceded that many of FSB's contributions to charitable organizations are not constructive dividends to petitioners. In this instance, however, and in others where FSB has made expenditures that relate to charitable entities, petitioners have failed to argue or prove that these expenditures *412 were deductible as charitable contributions, or that such expenditures brought them no personal benefit. See Knott v. Commissioner, 67 T.C. 681 (1977). In 1990, FSB paid $ 5,425.36 of petitioner's legal fees and the charges incurred in obtaining a letter of credit. These fees arose from the settlement of a legal dispute between petitioner and another shareholder, Mr. Browne. Petitioners have not demonstrated that these expenses primarily benefited the corporation as opposed to benefiting petitioner personally in his status as a shareholder of the corporation. [14]
*413 The parties have addressed many other issues concerning whether miscellaneous FSB expenditures constituted constructive dividends to petitioners. These issues repeat the considerations we have addressed in earlier portions of this opinion. For convenience we have set forth, in an Appendix to this Opinion, our findings concerning the extent to which such miscellaneous payments constitute income to petitioners. IX. Investment Interest Expense
Salida Coca-Cola (Salida) was a corporation that, in 1988, became an "electing small business corporation", otherwise known as an S corporation. In the beginning of 1990, petitioner owned 50 percent of the shares of Salida. Stephen Browne owned the other 50 percent. Mr. Browne and his family business also owned substantial amounts of FSB stock. Petitioner owed money to Salida in connection with a personal acquisition. Petitioner and Mr. Browne became involved in a dispute, which eventually resulted in the redemption of petitioner's shares in Salida and the redemption of the Browne shares in FSB. Toward this end, petitioner entered into a written agreement dated February 9, 1990. The agreement stated, in pertinent part: All *414 payments made by Frazier [petitioner] pursuant to Paragraph 6(a) of this agreement shall be applied to the extent required to Frazier's indebtedness to Salida. Upon application of all such sums to Frazier's indebtedness to Salida, and as additional consideration for the purchase of the Salida shares, Browne shall cause any remaining indebtedness of Frazier to Salida to be fully released and discharged and shall deliver to Frazier at the closing satisfactory evidence of such release and discharge.
Petitioner relinquished his shares in Salida pursuant to a Redemption Agreement dated April 2, 1990. The consideration for his Salida shares was recited as $ 217,000.00 cash from Salida to petitioner plus "other good and valuable consideration". The parties executed a Settlement Agreement and Mutual Release, also dated April 2, 1990. It states, in pertinent part: In consideration of the premises, * * * the other purchases and sales described in the Redemption Agreement, * * * Salida, and each of them, hereby and forever release, discharge, and acquit each other * * * of and from any and all claims, demands, obligation, liabilities, indebtedness * * * which in any way arise out *415 of or are connected with or relate to * * * (iv) all indebtedness of any kind whatsoever of Frazier to Salida * * *.
On their Federal income tax return for 1990, petitioners treated the sales price of their Salida stock as $ 395,295. This figure consisted of the cash consideration of $ 217,000, the discharge of petitioner's loan from Salida of $ 68,938, and the discharge of the $ 109,357 interest that had accrued on that loan. Petitioners separately deducted this $ 109,357 amount as an investment interest expense. This deduction was proper. The transaction had the same practical effect as petitioner's redeeming his stock for $ 395,295 in cash, and then using the cash to pay off his loan, plus accrued interest. He is entitled to deduct the interest. Respondent argues, however, that the amount of petitioner's debt should not be considered as part of the sale price, because "there was no evidence that the value of * * * [petitioner's] stock in Salida was independently valued at the time of the sale." It is settled, however, that where a sale of the property to be valued has been made at or about a crucial date, the sale is acceptable evidence of value. Andrews v. Commissioner, 38 F.2d 55 (2d Cir. 1930), *416 affg. 13 B.T.A. 651 (1928); Flynn v. Commissioner, 35 B.T.A. 1064 (1937); Walker v. Commissioner, T.C. Memo. 1982-495 (citing Tripp v. Commissioner, T.C. Memo. 1963-244, affd. 337 F.2d 432 (7th Cir. 1964)); see Narver v. Commissioner, 75 T.C. 53, 97 (1980), affd. per curiam 670 F.2d 855 (9th Cir. 1982). Further, it is clear that negotiations between the parties were at arm's length. The operative documents show that Salida was willing to redeem petitioner's stock for $ 217,000, plus foregoing its claims against petitioner both for $ 68,938 in principal indebtedness, plus accrued interest of $ 109,357. The stock was thus worth $ 395,357 to Salida and to petitioner, who agreed to surrender his Salida stock on those terms. This figure constitutes an arm's length valuation of the stock. Respondent further argues that the redemption price was only $ 217,000, because "petitioners have failed to show that they paid any of the investment interest". Respondent's argument requires a *417 finding that petitioner's debt and accrued interest lacked economic substance. There is no indication, however, that petitioner's debt was invalid or uncollectible. The record indicates that petitioner was solvent and that he had signed, and agreed to be bound by, the instrument of indebtedness. In fact, Salida's accountant testified that Salida regarded the debt as valid, and that Salida had accrued the interest income annually, based upon the anticipated collection of the debt and accrued interest from petitioner. The debt and accrued interest were valid. In effect, petitioner paid his debt and accrued interest in part by giving the creditor (Salida) his stock in Salida. We conclude that petitioners properly deducted $ 109,357 in interest expense for 1990. There is, however, a further consideration. Respondent argues that to allow petitioner this deduction will result in a double benefit to petitioner. This is because of Salida's post-redemption accounting treatment of the accrued interest. Salida's tax returns were not prepared by the same accountant who prepared petitioners' return. Salida's treatment of the payment of accrued interest was inconsistent with petitioners'. *418 Salida had in the past been accruing interest income annually, based upon the accumulating amounts of interest that petitioner was obligated to pay on his debt. Before 1990, the total of accrued interest amounted to approximately $ 87,700. For the period in its 1990 taxable year before the redemption of petitioner's stock, Salida accrued another $ 21,600. This amount had not been reported on a Salida return as of the time of redemption. By the time of the redemption, the total accrued interest owing was approximately $ 109,300. [15] Salida's new accountant, however, decided to "treat that interest as though it had never accrued" as income for purposes of Salida's return. Salida made the same decision regarding the $ 87,700 accrued interest owed by petitioner which Salida had previously accrued as income. Salida had reported this accrued interest in "old returns", including Salida's years as a "C" Corporation. Salida's accountants decided that, "since we * * * didn't want to go back and amend those returns, to * * * call it [the discharge of petitioner's accrued interest] interest expense of Salida for the current period, so that, in effect, this return treats the accrued interest *419 income of $ 109,000 like it never happened." Thus, petitioner's accrued interest obligation of $ 109,357 was shown as an interest expense of Salida's. Salida's accountants sent a Form K-1 to petitioner. This form reflected their computations of Salida's income and expenses that petitioner was to, and did, include in his 1990 tax return. The K-1 reflected a loss of $ 93,299. The computations that produced that loss included petitioner's 50-percent share of the $ 109,000 interest expense that Salida's accountants had created in order to treat Salida's accrual of interest income "as if had never happened". Under section 446(b), respondent has "broad powers of determining whether accounting methods used by a taxpayer clearly reflect income". Commissioner v. Hansen, 360 U.S. 446, 467 (1959). *420 Respondent's authority under section 446(b) reaches not only overall methods of accounting, but also a taxpayer's method of accounting for specific items of income and expense. Keller v. Commissioner, 725 F.2d 1173, 1179 (8th Cir. 1984), affg. 79 T.C. 7 (1982); Prabel v. Commissioner, 91 T.C. 1101, 1112 (1988), affd. 882 F.2d 820 (3rd Cir. 1989); sec. 1.446-1(a), Income Tax Regs.
Section 163(a) allows as a deduction from gross income "all interest paid or accrued within the taxable year on indebtedness". Under the accrual method of accounting, interest is deductible "for the taxable year in which all the events have occurred which determine the fact of the liability and the amount thereof can be determined with reasonable accuracy." Sec. 1.461-1(a)(2), Income Tax Regs.; see Lay v. Commissioner, 69 T.C. 421, 434 (1977); sec. 1.446-1(c)(1)(ii), Income Tax Regs.; see also United States v. General Dynamics Corp., 481 U.S. 239 (1987). In this instance, we believe that Salida's reporting of a $ 109,357 interest *421 expense deduction for itself was not only strange from an accounting standpoint but also improper. No events had occurred which would determine that Salida was liable for the interest deduction at issue. To the contrary, Salida in effect received interest payments with its receipt of petitioner's Salida stock. Accordingly, it was improper for Salida to include, on petitioner's Form K-1, one-half of Salida's imaginary interest expense deduction of $ 109,000. To the extent that petitioners' taxable income is affected by deducting their share of the resulting losses, that deduction was improper. [16] Respondent acted properly, and within the scope of her authority, in disallowing this deduction of Salida's nonexistent interest expense. The impact of backing-out one-half of the adjustment must be determined in the Rule 155 computation to give consideration to any unused losses because of basis limitations. *422 X. Additions to Tax and Penalties
A. Section 6653(a)(1)
For the years 1986 through 1988, respondent determined that petitioners are subject to an addition to tax under section 6653(a)(1), and for the years 1986 and 1987, to increased interest under section 6653(a)(1)(B). These provisions apply if any portion of any underpayment is due to negligence. Negligence is lack of due care or failure to do what a reasonable and ordinarily prudent person would do under the circumstances. Neely v. Commissioner, 85 T.C. 934, 947-948 (1985). Here the long-established principles provide that FSB's payment of petitioners' personal expenses resulted in income to petitioners. They should have reported such payments as income, but they did not. Their conduct in this regard fell short of the due care standard required of taxpayers filing their income tax returns. Accordingly, we hold that they are liable for the additions to tax under section 6653(a). B. Section 6661
Respondent determined additions to tax under section 6661 for the years 1986 through 1988. Section 6661(a) provides that if there is a substantial understatement of income tax, *423 there shall be added to the tax an amount equal to 25 percent of any underpayment attributable to such understatement. An "understatement" is defined as the excess of the tax required to be shown on the return over the tax actually shown on the return. Sec. 6661(b)(2). An understatement is substantial if it exceeds the greater of (1) 10 percent of the tax required to be shown on the return, or (2) $ 5,000. Sec. 6661(b)(1). This threshold amount must be met before the addition applies. The amount of any understatement is to be reduced, however, for an item if there was substantial authority for the treatment of that item by the taxpayer. Sec. 6661(b)(2)(B)(i). The amount of any understatement is also to be reduced for an item if there was adequate disclosure in the return of the relevant facts affecting treatment of that item by the taxpayer. Sec. 6661(b)(2)(B)(ii). Petitioners have shown no substantial authority for their failure to include items of income on the Federal tax returns for the years involved, nor have they set forth in their returns the relevant facts concerning FSB's payment of their personal expenses. Further, petitioners have not shown they had reasonable *424 cause for the understatements. See, e.g., Mailman v. Commissioner, 91 T.C. 1079, 1083 (1988). We hold that petitioners are liable for the addition to tax under section 6661 for each of the years 1986, 1987, and 1988, if their understatements for each of the years involved exceed the greater of $ 5,000, or 10 percent of the tax required to be shown on their returns. We further hold that all of their underpayments are attributable to such substantial understatements. C. Section 6662
For petitioners' taxable years 1989 and 1990, the accuracy related penalty provisions of section 6662 were replaced by section 7721, Omnibus Budget Reconciliation Act of 1989, Pub. L. 101-239, 103 Stat. 2106, 2395. Under section 6662, either negligence or a substantial understatement of income tax will incur an addition to tax of 20 percent of the underpayment. In other respects, the provisions for negligence and substantial understatements are substantially unchanged. Section 6664(c) provides, however, that the accuracy-related penalty will not apply to a portion of the underpayment when the taxpayer shows that such portion was made with "reasonable cause" and *425 that the taxpayer acted in good faith. The pertinent regulations state, "Reliance on an information return, professional advice or other facts, * * * constitutes reasonable cause and good faith, if, under all the circumstances, such reliance was reasonable and the taxpayer acted in good faith." Sec. 1.6664-4(b)(1), Income Tax Regs.
For the years 1989 and 1990, we hold that petitioners are liable for the penalties for negligence and for substantial understatements with respect to the unreported amounts of constructive dividends that FSB paid for their benefit. The considerations that govern the additions to tax for 1986 through 1988 apply to the later years as well. It is a different matter, however, for the portion of the 1990 underpayment attributable to petitioners' claiming their share of Salida's improper interest deduction. The circumstances show that, with respect to Salida's interest deduction, petitioners reasonably relied, in good faith, upon the Form K-1 they received from Salida's professional accountants. Accordingly, the portion of the 1990 underpayment attributable to petitioners' claiming their share of Salida's improper interest deduction was made for "reasonable *426 cause" under the pertinent regulations, and the accuracy-related penalty does not apply to that portion. To reflect our conclusions on the disputed issues and to give effect to concessions made by the parties, Decisions will be entered under Rule 155. APPENDIX We have found each of the dollar amounts shown to be personal expenses of petitioners and not directly and proximately related to the business of FSB. A. Taxable Year 1986  Personal
[Issue 6] Expenses for Mrs. Frazier and Lloyd in Dallas $ 769.54
[Issue 7] Expenses for Mrs. Frazier in Dallas 230.00
[Issue 19] Meal expenses at Olive Tree in Wichita
100.42
[Issue 23] Airfares for Lloyd and his friend plus fee
795.00
[Issue 30] Dallas expenses of Nancy, Lloyd, Julie
453.67
[Issue 31] Carfare and breakfast for niece
24.60
[Issue 35] Gifts for sister and her husband and others
329.75
[Issue 38] Meals for callers at mother's funeral
102.90
[Issue 39] Personal expenses in Dallas
795.64
B. Taxable Year 1987  [Issue 45] Florida Christmas trip, conceded personal
$ 5,686.47
[Issue 46] Personal expenses in New York
1,401.97
[Issue 47] Dallas expenses of Nancy, Lloyd, and friend
788.72
[Issue 48] Meals and Drinks for family and friends
833.12
[Issue 57] Travel for counseling, Wickenberg, Arizona
2,416.94
[Issue 60] Nancy's and other expenses, Newport Beach
[17] 598.27
[Issue 61] Ticket to Europe for godson
1,132.00
[Issue 62] Stipulated adjustment, no response
917.66
C. Taxable Year 1988  [Issue 66] Christmas in England, Fraziers paid $ 4,701
[18] $ 8,000.00
[Issue 68] Dallas expenses of Lloyd, Nancy, misc.
566.83
[Issue 69] Dallas expenses of Lloyd, friends, other
566.83
[Issue 86] 7-Up China trip; FSB paid personal expenses
1,572.20
[Issue 88] Dinner expenses of Nancy, Mr. Koch in NY
237.20
[Issue 94] Dinner for Mr. Sayshi, visiting Friends Univ.
121.86
[Issue 95] Wine expense of $ 133.80 was for business
0.00
C. Taxable Year 1988  [Issue 97] Pritikin Center visit by petitioners [19] $ 2,340.59
[Issue 99] Expenses of Cadbury Trip London-Paris [20] 6,225.04 *428 [Issue 100] Lloyd's expenses in Denver
513.69
[Issue 101] List of items
[21] 111.00
[Issue 104] List of American Express charges
[22] 623.26
D. Taxable Year 1989  [Issue 106] Nancy's airfare in San Diego
$ 637.04
[Issue 107] Nancy's expenses at Schweppes convention
1,002.55
[Issue 108] Nancy and other personal expenses, NY
[23] 8,542.57
D. Taxable Year 1989  [Issue 110] Lloyd and Shawver expenses in Colorado
[24] $ 481.11
[Issue 111] Petitioners' Denver and San Francisco trip
[25] 1,540.43 *429 [Issue 112] Petitioners' claimed auto repair expenses
[26] 149.49
[Issue 121] Nancy's expenses, CBI trip to Puerto Rico
[27] 514.36
[Issue 125] Petitioners' Wichita meals, air fare upgrade
75.49
[Issue 126] Pasta sauces for office
0.00
[Issue 127] Mrs. Frazier's expenses for funeral service
571.75
[Issue 128] Books for use in office
0.00
[Issue 129] Wine for NSDA recruitment efforts
0.00
[Issue 135] World Business Council dues
950.00
[Issue 138] Caterer's charges FSB kitchen 1989
533.09
E. Taxable Year 1990  [Issue 138] Caterer's charges FSB kitchen 1990
[28] $ 587.82
[Issue 143] Nancy's expenses, auto repair trip
130.25
[Issue 144] Lloyd's expenses, Dallas trip
72.23
[Issue 145] Petitioners' expenses at KC wedding
178.91
E. Taxable Year 1990  [Issue 146] Petitioner's expenses at Missouri wedding
$ 457.63
[Issue 150] Variety of items
[29] 1,002.00
[Issue 155] Relatives' expenses, Bath, Me.
39.95
[Issue 169] Chicago trip - personal expenses
59.82
[Issue 170] Chicago trip - miscellaneous expenses
77.60
[Issue 171] Breakfast
19.33
[Issue 173] Chicago meal expenses - Nancy and Lloyd
20.66
[Issue 175] Breakfast at Four Seasons
19.46
[Issue 177] Acton Institute contribution
0.00
*427 Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years in issue; Rule references are to the Tax Court Rules of Practice and Procedure.↩
1. For the years 1986 and 1987, respondent determined that petitioners are liable for 50 percent of the interest due upon the deficiencies at issue, pursuant to the provisions of sec. 6653(a)(1)(B)↩.
2. Both petitioners and respondent have made certain concessions in the stipulations and in the briefs↩
3. We note that the parties agree that FSB's earnings and profits exceeded the amounts of corporate distributions here at issue.↩
4. The strict substantiation requirements of section 274(d) preclude our making such approximations in deciding the amount of travel and entertainment deductions that the corporation may claim. As we have pointed out, however, "The Congressional committee reports make it clear that since the only purpose of sec. 274 is to disallow deductions, it does not affect the question of the includability or excludability of an item in income of any individual, and that the usual rules are applicable in this respect. See H. Rept. 1443, 87th Cong., 2d Sess., p. 20, and S. Rept. 1881, 87th Cong., 2d Sess. p. 27." Ashby v. Commissioner, 50 T.C. 409, 418↩ n.5 (1968).
5. Petitioner discussed with his niece, Martha Fassett, his planned speeches on several occasions when he was in Washington, D.C. This usually occurred at breakfast meetings. We find these costs to be primarily personal in nature.↩
6. Respondent's revenue agent reports included other amounts in income. Petitioner argues that these additional amounts are those already included on the vouchers and are duplications. Our examination of these figures indicates that petitioner is correct.↩
7. This voucher also included a contribution of $ 500 for "Dave Bayouth for County Commissioner". We accept petitioner's representation that this was a legal corporate contribution and was not a personal expense of petitioners.↩
8. Respondent, apparently through oversight, asserted only 80 percent ($ 443.80) of the dinner for Mr. Shawver and only 80 percent ($ 264.00) of the 1988 dues as income to petitioner, and respondent agrees to abide by that determination.↩
9. We note the possibility that FSB's expenses on behalf of Mr. Shawver could be deemed to be a dividend to him. There is no indication that Mr. Shawver was a member of the Confrere, however, and FSB's payment is more properly deemed a constructive dividend to petitioner, who entertained Mr. Shawver as his guest.↩
10. Petitioner testified that he went to San Francisco to have his sister sign some business documents. He apparently was unsuccessful. Petitioners have not convinced us that the purpose of the visit was primarily business related, and we find these costs to be personal.↩
11. We have earlier held that costs connected to the CEO Club have not been shown to be proximately related to the business of FSB.↩
12. This figure does not include $ 1,004.00, shown on the voucher as tickets turned in for refund. This refund is not personal income to petitioners.↩
13. To the extent these expenses may not be, strictly speaking, medical expenses, they are nevertheless payments of personal benefits and taxable as constructive dividends to petitioners.↩
14. Petitioners argue that respondent has abandoned these unnumbered issues, and some others, by failing to address them in the "Argument" portion of her opening brief. Respondent, however, has contested these matters, which are inherently factual issues, in either her opening or reply briefs. Taking into account the status of the record in these cases, we cannot say that these issues have been abandoned. They remain properly before this Court.↩
15. Salida's accountants' workpapers indicate that Mr. Frazier's accrued interest came to $ 109,401.31, as opposed to petitioners' figures of $ 109,357.00 for the same item. The difference is not explained, nor is it material. We have used petitioners' figures.↩
16. Petitioner's surrender of his Salida stock thus produced a possible double deduction. The first occurred when petitioners properly deducted the $ 109,357 investment interest expense. The second came when petitioners gave effect to their 50-percent share of Salida's deemed interest expense for the same item. The Code should not be interpreted to allow the equivalent of a double deduction. United States v. Skelly Oil Co., 394 U.S. 678, 684 (1969); United Telecommunications, Inc. v. Commissioner, 589 F.2d 1383 (10th Cir. 1978), affg. 67 T.C. 760 (1977) and 65 T.C. 278↩ (1975).
17. We do not accept respondent's contention that petitioner's expenses on this trip to California were personal. They were business related.↩
18. We accept petitioner's explanation that some part of this trip was related to the business of FSB, and further, that some amounts that respondent asserts were paid by FSB were, in fact, paid by petitioner. Petitioner's allocation of such expenses is excessive. Our best judgment is that $ 4,000 is allocable to business. FSB's $ 8,000 payment is personal expense of petitioners.↩
19. We do not accept petitioner's argument that this expense was related to the acquisition of key man insurance.↩
20. Our finding reflects our acceptance of petitioner's contention that a $ 1,561 dinner was a business expense for thanking the travelers' hosts, and that some amounts charged to petitioner ($ 186.50) relating to his fellow-shareholder, Mr. Browne, were not personal to him. Additionally, the following items are also duplications of personal expenses and are subtracted from constructive dividend income: $ 474.60 (Bas Breau); $ 57.30 (Harrod's) and $ 50 (Via Venetian). The $ 712 "NSA advance" is not properly a personal item. The invitation to visit Sir Dominick Cadbury, however, was incidental to the personal benefit of petitioners' 4-day stay in London, as demonstrated by their $ 3,763.83 expenditure of FSB's money for nonbusiness purposes while there.↩
21. One of the items in Issue 101, petitioner has established that the following were business related: $ 26.00 lunch with employee; $ 12.97 Forbes subscription; $ 26.97 lunch with Wilkens; $ 25 corporate contribution to Pi Beta Kappa Phi Garden party.↩
22. Of the American Express charges listed, petitioner has established that the $ 252.95 was for the kitchen at FSB's headquarters and was primarily business related. We reject petitioners' claim that respondent is attempting to shift these and other expenses to different taxable years. Respondent has adequately and timely informed petitioners of the adjustments at issue and the years to which they relate.↩
23. This issue also involves issues 98 and 115. We have accepted petitioner's explanation that he purchased $ 689.45 in wine for business purposes. Petitioner's vouchers accurately reflect the New York room charge.↩
24. Petitioner has demonstrated that $ 315.23 for a hotel room and one-half of the charged golf expenses, some $ 64.23, were not for him but for John Shawver, another FSB shareholder. These are not petitioners' personal expenses. A meal costing $ 92.45 is a business expense.↩
25. Petitioner insists that this trip had a business purpose because he obtained his sister's signature to a document in which she agreed to pledge her FSB stock to collateralize a loan. We disagree. Petitioners have not shown that this related to the business of FSB. The loan was not to FSB, but rather to petitioner, Mr. Browne, and an entity named Salida Coca-Cola.↩
26. We accept petitioner's representation that he took the company car, a Range Rover, to Kansas City for repairs. With respect to that trip, however, FSB paid personal expenses of $ 114.67, relating to Mrs. Frazier's meals and tips, and other personal expenses of $ 39.81.↩
27. We accept petitioner's representation that his trip was for business purposes. FSB paid for Mrs. Frazier's personal expenses, however, including her air fare of $ 322.50, plus one-third of the Brodkin meal, one-sixth of the Lowenkren meal, one-fourth of the Lockwood meal, and one-half of meals with her husband, totaling an additional $ 196.86.↩
28. This amount represents the costs of three luncheons involving the Salvation Army, which held the meetings at FSB as a convenience to petitioner. There is no factual information that this meeting had a FSB business connection.↩
29. In addition to respondent's concessions, we find that a luncheon for $ 19.00 with Mr. Small was business related.↩